This time we'll hear Tedesco v. Brigham. Good morning. May it please the court, my name is Eric Weinstein. I represent the appellant, Wendy Tedesco, who is also the plaintiff and counterclaim defendant in the case below. In my seven minutes, I'm going to roughly split my time between the set-off issue, which leaks into whether there was an adverse benefit determination, and the medical necessity issue. I'm going to start with the set-off. Coordination of benefits provisions. The very purpose is to protect the benefits and distribute the burdens between two plans. In fact, the plan here says explicitly, these COB rules will not reduce your benefits in any way. So what happened here? Ms. Tedesco did not enroll in her employer's plan. She did not inform the fund. She had no duty to do that. The plan only says you have to inform if you are covered for the purpose, I presume, of avoiding double payments. It makes no difference whether she informs. The terms of the plan basically makes this plan excess to a plan that she could obtain through her employer, and she didn't obtain it. Well, that's not how we read it, Your Honor. Because what the fund is doing is they are exercising what they claim is this subtraction right. So what they're saying is that because you could have received coverage somewhere else, let's say, for example, there's a $100 claim, and the fund would normally pay $90 because they pay 90%. If they paid the $100, that's an overpayment of $10. That's more than she's entitled to. What the fund, under the subtraction provision, says, well, we would pay $90, but we're going to reduce from that. If your employer would pay $50, then we're only going to pay $40. Right. So my first argument is that's illusory. That is, there was no attempt here to determine what Mr. Destler's employer's plan would have paid. They just reduced the entire amount. They basically said you're forfeiting your benefit because you didn't inform us that you were – because you didn't enroll in the coverage. But what – so if they don't exercise that subtraction right, which they didn't do here, then the question is can they go back? Are those fund assets? Because they didn't exercise the subtraction right, can they go in a set-off, which is basically a common law counterclaim, which I don't think the district court had jurisdiction over? Doesn't the plan say that they can offset? Only for an overpayment of benefits, and that's where the Nachman decision comes in. The benefit remained the full – those benefits vested when she had the medical care that she was given and she got the $100 of benefits, that benefit was $100. That benefit wasn't reduced. That's what the Nachman case says. So there was no overpayment of the benefit. The benefit was still the $100 claim. They just didn't exercise this, what I would say is an illusory subtraction right. And then they can come back a year later and say, wait, those are our funds. Those aren't your funds. Now, if you have a – you may have a set-off claim under common law. I don't understand why this plan would view it as an overpayment if they were paying something that they didn't have to pay under the plan because your client was supposed to get such insurance that she could get through her employer. Well, there's no way for them to determine what they would have paid even if she had gotten the insurance. That is, let's say she chose the EPO versus the PPO plan. But then you're making that requirement a nullity. Well, we are claiming that the subtraction provision is illusory because there's no way for them – but they didn't even attempt. There's no way for them to figure out what was it that her plan would have paid. So what should they have done? Let's roll this all the way back to the beginning and following up on what Judge Jacobs is asking. Okay. What conceivably they could have done is upon – We're not going to come to you because you haven't told us that. What they could have said is upon her submission of the claim in 2013, they could have said, we're not paying that claim because you're deemed coverage. We're going to reduce that claim. We're going to try to figure out what your plan would have paid. And we're going to reduce that claim and pay some portion of it. What they can't do is say a year later, come back and say, wait a second, that's a set-off claim. That's a common law set-off right. That's not – the ERISA doesn't give them the right to set that off. Now it's the books looking back over what they've overpaid. Well, first of all, again, it's not an overpayment. That is – Yeah, I mean, that's the concept I'm having difficulty with. Right. Well, it's not a simple concept, but it's one that Nachman addressed. That is, in the Nachman case, we have the $77 claim and there's only $27 left of assets. And the Supreme Court – the dissent said, well, that's a – now that's a $27 claim. That's all the assets that are there. And the majority decision said, no, no, that's a $77 claim, not a $27 claim. The fact that there may have been some amount subtracted from the $77 – How would one plan know what the terms are of the other plan? Now – That's a good question. Your client would know. And usually, burdens are distributed based on what people would naturally know and have access to. So if there was some sharing principle, if the employer plan would have paid something less than the full amount that this plan paid, your client would have been in a position to point that out. First of all, they would have to ask, which they didn't. But second of all, how would she know? Why should they ask? They want as much as they can. Well, she has two options. There's an EPO plan and a PPO plan. Are we going to assume which plan she was going to sign up for? The EPO plan has no out-of-network coverage. That means her plan would have paid zero to Nicholson and Levine, who are outside the plan. So that's why I'm saying this is illusory. They made no attempt to try to figure it out. This is like going to a guarantor on a debt and saying, I asked the principal obligor, the person won't pay, so now I'd like you to pay as the guarantor. The guarantor pays, finds out that the principal would happily have paid, and says, you know, I overpaid. They can't collect a debt in this action. They can't collect a debt in this action. If this is a debt, that's— Debt is my hypothetical. I'm just saying if you go to a guarantor and collect a debt that you could have collected from the primary obligor, the guarantor would naturally view it in terms of overpaying on the obligation to guarantee, because there was no default. Except the guarantor lost to Nachman. That's exactly the case, Your Honor. The guarantor thought, oh, that's an overpayment. And it turned out it was not an overpayment because the benefit was the full $77. That's exactly what was decided, Your Honor, below—I mean, by the U.S. Supreme Court and Nachman. On the medical necessity issue, which I may— We do have all these briefs. It's not like— Yeah, okay. I think basically they have to state the reasons in the letter, which they didn't do. They didn't do. So what's the consequence? Well, do they at least have substantial evidence to support their— It changes the nature of the question. Well, yes. It stops being, arguably, under HALO. It would stop being a question of whether what was done was arbitrary and capricious, and it would come into consideration in some other standard of review. Ultimately, there was no substantial evidence to support their claim of no medical necessity because we had—they have to apply the plan definition. And the psychodemic psychotherapy that she was receiving from Levine— Not in this case. Remember, it has to be an individual assessment under the Miller case in this court. And the determination was this is a severe case and that the supportive therapy was needed and was working. So there was no determination made by— The only determination made by their doctor was that it was not curing her. But that's not—we have to apply the plan definition, not the doctor's opinion of what they believe is effective. Thank you. You've reserved your Bible. We'll hear you then, sir. Thank you. Good morning, Your Honors. Good morning. I have a question, Counsel. Certainly. You believe, don't you, that the appellate courts adjudicate cases pending on direct appeal according to the law, then in effect, that is now? Yes. You argue in your brief that because HALO was in effect at the time this took place, they don't get the benefit of it. That's not correct, is it? What I was arguing, Your Honor, and what I argued this morning—and by the way, I'm Jewel Smith. I didn't introduce myself. I knew you'd ask about HALO. What we're arguing about HALO was the plaintiff had argued in her complaint, had alleged that we did not comply with the terms of the plan, in terms of the notice, and also that we did not comply with the regulations. That argument was not made. It was not preserved. There are scores of cases prior to HALO where the plaintiffs, in fact, did make the arguments. And we know that the Second Circuit changed the analysis. But by failing to make the argument, it precluded the district court from analyzing the argument. It may very well— Did the district court get another opportunity to analyze it? That's not necessary, and I'll explain why. HALO made it clear that if the notice was defective, you still don't— the number one thing that happens is you have a de novo review, which I think Your Honor was beginning to allude to. But we can show, and that's the other part of HALO, that our rules comply with the regulations. In fact, our rules are identical to the regulations. You didn't give a reason on the denial of the service. That's their argument, that you're in noncompliance. That's correct. But let me follow through on the logic of this in HALO. We didn't, assuming that our notice was not adequate, which I think it was. I'll describe that in a moment. We did, in fact, provide notice in a more general way as to what the problem was. We did follow the procedure required on appeal. For instance, we did have sequential doctors reviewed. We didn't avoid that requirement. And finally, the error was harmless. Why do I say the error was harmless? First of all, the plaintiff testified that there was nothing more that she wanted to submit to the trustees, that the record was complete. If there was a claim that we didn't, because of our defective notice, she didn't get to submit something that she wanted to, certainly that would have been prejudicial to her. Now you're talking in terms of supplementing the record. My understanding of the line of questioning by Judge Pooler is that HALO came down. HALO could be a game changer. It wasn't reviewed de novo by the district court, whatever was in the record or not in the record. And this is not a matter of appellate jurisdiction. I mean, it's a rule of prudence. It makes a lot of sense. But in a case like this, it may make also sense to exercise discretion, to consider HALO as having a bearing on this case under these circumstances and ask the district court to revisit it under what per HALO would be the proper standard of review. Let me suggest why the case does not need to go back to the district court. And the reason is what should happen if there's a HALO violation and we can't satisfy the other requirements, what results? What results is a de novo review. And if I can take you back to January 9th of 2014, when the trustees reviewed the appeal, if we were there, what would we have before us? We would have two opinions from board-certified psychiatrists, Dr. David Anthony and then Dr. Michael Rader. I can save you trouble. We don't usually do de novo review of facts. For one thing, it's really hard to do it with three judges. And the other is this is not our department. We understand. But what I'm suggesting is if you look at the record, you can see that a de novo review comparing those facts, it's an administrative-type appeal. You can review those facts, that administrative record, and one can see that the finding of medical necessity for psychiatric review, psychiatric services, was medically necessary. But that seeing the social worker was not medically necessary. There was nothing in the record to support that. Look, I might even agree with you, but why is it obvious? It's not like she was seeing a manicurist. I mean, she was seeing somebody who deals with people who have problems adjusting to their environment. And that's what a social worker does. It's not – it could be disallowed, possibly. But it's not something that's so obviously an abusive claim. I'm not sure that I follow you. We're not claiming – making any claim that it was in any way abusive. I know, but here's the thing. Your letter didn't explain why somebody who might arguably make a useful contribution to the treatment of your insured is not entitled to a reimbursement for a service that she feels she needs. I understand that. My point, what I was getting at, is on a de novo review of this record, it's clear that that decision was rational. It didn't violate the law. Was it explained from HALO? No, it wasn't. But what I'm suggesting, if it goes back to the district court, what the district court does is a de novo review. That's – and you only do – It's unfortunate one has to go through things twice, but we have a case that changes the landscape. Well, it did. The landscape being the standard of review. We don't have an opinion. The district court has not had the opportunity to deliver to us an opinion under what is now the governing standard, if indeed your letter is inadequate. That's right, Your Honor. What I'm suggesting, though, is as I read the cases, it's not unusual for the appellate court to do a de novo review in the same way that the district court would have done. Oh, we can. And I'm suggesting that if you do that, you'll find that there's – that the decision that the trustees made wasn't just an appropriate decision, but I believe it was the only decision they could make because, amongst other things, there was no medical evidence submitted. There were no studies. There were no Physician Specialist Society recommendations in the record that said, yes, this type of supportive service is necessary, is medically necessary. So there's no evidence to the contrary? That's your view? That's my view, Your Honor. There is nothing – there are no physician recommendations, and there's some controversy about that. But if you do a de novo review, one goes to the plan, and the plan makes it clear that it has to be recommended by a medical doctor. Now, we did not pursue that below, but if you do a de novo review, you have to apply the terms of the plan. If there's de novo review, would the plaintiff have an opportunity to submit additional evidence? No, because it's on the closed record. It's on the record. The de novo review would be on the record that was established, and the plaintiff agreed that the record was closed. Does HALO require that on the preexisting record? I'm sorry? Does HALO require that? HALO would say if you fail HALO, the HALO test, you get a de novo review of the record. It's not – you don't retry the case. A de novo review of the record looks like what? Substantial evidence supporting the conclusion? Absolutely. In fact, I don't think there's any evidence in the record that doesn't support the conclusion. Look, if the plaintiff said, you know, I now know what you're saying, and I want to submit a note from my doctor that says, you know, I need this, that's one thing. The record's closed. Once they knew everything, they didn't say, oh, well, you know, I need to submit something else. But why wouldn't the new standard allow the district court at its discretion to take additional evidence? First, I don't believe that HALO changed that. When all HALO says – It changed the standard of review. Correct. A plaintiff may not have put in evidence when the standard was arbitrary and capricious, but now understanding that the standard is de novo, the plaintiff might very well want to put in additional evidence. Once you supply the reasons, scientific and medical, for turning down the social worker. Well, it's always de novo. It's always de novo. Either you take our determination the way it is, you view the arbitrary and capricious test, or it's de novo. HALO didn't change that standard at all. The plaintiff knew by the time we were in court exactly what we were saying. Didn't say, oh, you know, I was prejudiced because I didn't get to submit this. I have one other point that I need to make. I know I'm out of time. Very briefly. Very briefly. On the coordination of benefits, I'll just mention that all the money has been recovered now on offset. I know, but isn't there a counterclaim? We withdrew the counterclaim. We withdrew the counterclaim because of Montanale. The Supreme Court case that said you can't, that's why we withdrew it. It's no longer before the court. It was dismissed below. After the judge ruled in our favor, Montanale came down, which says you can't trace, even without language. We didn't have it, so we withdrew that claim. Nevertheless- We recovered all the money. We've recovered it through offset. I understand that. Yes. But there's no counterclaim. We don't have a counterclaim pending anymore. Because nothing, you're not entitled to more money. No. We withdrew the counterclaim before all the money was recovered by offset. The counterclaim would have given us the right to pursue the- You only recovered partially what you were seeking through offset. At the time we withdrew it, that's correct. But after, since the district court ruled and we withdrew, at that time we had withdrawn our counterclaim. The remaining monies were recovered through offset. Through, the plaintiff continued to make claims, health claims. We credited those against the money that she owed. Are you still doing that? No, because all the money was repaid. All the money. All the money. Not through the counterclaim, through the offset. What's the counterclaim for, if not the offset? It was to give us the ability to pursue the plaintiff, to pursue the assets that she received, to dig into her bank account, find out where she spent the money, and get- If you had no right to the offsets, hypothetically, and you have offset, then isn't there a claim on the other side to get back what should not have been offset? That raises a question of, is that equitable relief or legal relief? Well, in any event, it's a question. So I don't see how you can say that the thing is no longer before us. What I said, what is not before your honors, is our counterclaim, because we withdrew the counterclaim. Okay. The offset issue, all I was suggesting is all the money's been paid. We're not offsetting anything more. You're happy. Now they're not. I'm not happy, your honor. I represent a client who- Your personal happiness. Okay, thank you. I hope you're personally happy. I'm always happy when I argue before the second circuit. My client has done its fiduciary duty, and I am satisfied for my client. Thank you, Mr. Epstein. Thank you. Mr. Epstein. Happy to spread a good word. Can you address the last issue before you launch into a team? Are you looking for sort of repayment of what they've claimed is offset? Well, one of the claims that was dismissed by the district court was our claim that that setoff that they had already begun to invoke was unlawful. Which they've now completed. They've now completed it, but it was unlawful when they started it because it was about fund assets. The question is what's left here now. What's for us to decide about this offset? Your adversary says there's no problem with the offset because it's all been offset. Do you agree? No, the offset was illegal. That was our third claim for relief, that they should not have been offsetting because those were not fund assets. That's a counterclaim that they might have in common law, which I don't think they have because I think that's- Consistent with my understanding. Please continue. Okay. So back to the Levine services, the environment for that was not in the nature of a manicure. But Ms. Tedesco was highly resistant to medication because of these fears of contamination, that the medicine was contaminating her. So that she had this supportive therapy, the psychodemic psychotherapy, which addresses those irrational fears and gets her to take her medicine so she can comply with the APA guideline. And all the doctors, including their own doctors, assessment that she needs both ERP and medication in order to be treated for this condition. If you were to have the opportunity to argue to the district court on de novo review, what would you cite as substantial evidence in aid of your argument as the medical necessity of the social worker? Well, that's a good question. Your adversary said there's nothing. Well, in fairness, I think what Your Honor was getting to before is that one of the issues, for example, that the corporal said was that there's no doctor recommendation for supportive therapy. The letter didn't say, by the way, we're denying this because you don't have a physician's recommendation. But the letter, that's a mistake. That's bad. Let's assume the letter's defective. It did not explain that. Now the question is if it goes back on de novo review, the record is the record that's made with the submissions to the plan. And if you had a medical necessity, there was nothing that inhibited you from putting in evidence to say what we want, a social worker, and it's medically necessary. Now the question is what is the substantial evidence that any doctor said that the social worker is necessary? We have in the record, there are two medical doctors that have submitted letters. They have names? Yes, Dr. Danico and Dr. Nicholson. Both treated her. Danico on page 40 of the record says she needs this. What? Dr. Levine's supportive psychodynamic psychotherapy services. But isn't that the shrink? Why is that it's a social worker? That's the social worker. That's the psychodynamic psychotherapy given by the social worker. The shrink is giving the ‑‑ Social workers give psychodynamic therapy? That's correct. The social worker is helping her at a much lower cost, by the way, than Dr. Nicholson or Danico. The plan appreciates that. Is providing that outlet for her to address her irrational fears of contamination. Those services are being given by Levine. And Dr. Nicholson? Nicholson said in ‑‑ Whatever. Nicholson said, I believe on page 59 of the record, she's making progress under Levine. And it's working. Danico flat out says she needs it. But Levine is the shrink, right? No, Levine is the one giving the supportive therapy. That's Levine. But there are two actually shrinks in the record, other than Levine, saying Levine's services are required. The social worker is a doctor? The social worker is a social worker, no. But it doesn't have to be given by a doctor. I mean, nursing care is not given by a doctor. I understand that. The question is where would you look? Okay. Page 40. I have it. Page 40 of the record, your honor. Stephen Danico, he's a psychologist, the one who says it is strongly recommended that she engage in supportive psychotherapy one time weekly. Strongly recommended. Psychologist, a medical doctor? We also have Dr. Nicholson who said. Is this a medical doctor? Yeah, he's our treating psychiatrist, Nicholson. And he's the one who said that this treatment is working. You said page 59. I'm looking. 34. Thank you. No, but there's an interview with Nicholson on 54. And this is their doctorator's interview with Dr. Nicholson. And it says Nicholson stated the social worker is helping Tedesco maintain treatment with him. That is, Nicholson is trying to give her medication, she's resisting the medication, and he's saying Levine is helping her to take the medication that I'm prescribing. Pointed us to the pages. We'll be able to read it. Thank you. That's why I think the record supports it. Thank you both. We will reserve decision. The case of Offo versus Mercy Medical Center has taken on submission. The case of Barboni versus Argentina has taken on submission. And the case of Ramos-Gorin versus Lynch has taken on submission. That's the last case on the calendar. Please adjourn. Court.